2020 IL App (1st) 181971-U

THIRD DIVISION
September 30, 2020

No. 1-18-1971

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | 15 CR 13292 |
| v. | ) | |
| | ) | Honorable |
| DAVID ZEINTEK, | ) | Collen A. Hyland, |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated criminal sexual abuse affirmed over his many claims of error.

¶ 2    Defendant David Zeintek was convicted of a single count of aggravated criminal sexual abuse and sentenced to 23 years' imprisonment. Defendant appeals. We affirm.

¶ 3                                    BACKGROUND

¶ 4    In August 2015, defendant was charged in a 15-count indictment with 14 counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2014)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)). The gist of the indictments was that defendant, then 60 year's old, inserted his finger into V.J.'s vagina and placed his hand on her buttock "for the purpose of sexual gratification."

¶ 5    The incident in question occurred on July 19, 2015. On July 20, 2015, V.J. went to All Our Children's Advocacy Center, where she met with Bridget Carey, an interviewer and therapist. Carey conducted a "Victim Sensitive Interview" (VSI) with V.J.

¶ 6    On April 14, 2016, the State filed a motion, pursuant to section 115-10 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10 (West 2016)), indicating its intent to introduce V.J.'s statements during the VSI into evidence at defendant's trial. The State requested a hearing to determine if "the time, content, and circumstances" of V.J.'s statements during the interview "contain[] sufficient safeguards of reliability" so that the statements could be admitted at trial.

¶ 7    In March 2017, the court held a hearing on the State's motion. At the hearing, A.J. testified that she was V.J.'s mother. V.J. was born on April 30, 2009 (meaning V.J. was six years old on July 15, 2015). On July 19, 2015, she worked from 9 a.m. to 5:30 p.m. After leaving work but before arriving back home, A.J. received a phone call from her daughter, N.J., telling her that the police were at her apartment in Stickney, Illinois, and needed to speak to her.

¶ 8    When A.J. arrived at her home, she saw V.J., N.J., her son, whose initials are also N.J., and some police officers from the Stickney police department. According to A.J., one of the police officers told her that that "they had received a phone call that something had happened with [V.J.]; to talk to [V.J.] and try not to pressure her; whatever she wanted to tell me." In response, A.J. went into V.J.'s room and asked her what she did during the day. V.J. stated that she went to the mall, saw a "fountain with water," ate food, went to a Walgreens, and then came home. A.J. then asked V.J. if defendant had said anything about V.J.'s dress. In response, V.J. told A.J. that N.J. put it on her.

¶ 9    At that point, A.J. spoke to the police again, telling them that V.J. "had said nothing." The police then told A.J. that "they had to have [V.J.] go to attest [*sic*] and the ambulance was

going to come and pick us up." Although an ambulance eventually came, A.J. and V.J. were eventually driven by one of the police officers, first to the Stickney police station, and then to the hospital (the reason for the detour, according to A.J., was that the police officer needed to switch his squad car for a larger vehicle because the squad car was "very small.").

¶ 10    When they arrived at the police station, A.J. and V.J. went to the reception area to wait. While they were there, a woman whom A.J. recognized from her apartment complex came into the reception area. The woman asked a police officer if she could speak to A.J. Once given permission, the woman approached and "told [V.J.] to tell me the truth of what happened that day." According to A.J., [V.J.] "started crying and she said, yes, that [defendant] had touched her parts several times" and that she "didn't want to say anything because she was afraid." A.J. testified that V.J. explained to her that when defendant touched her, "he would pull down her pants and insert his fingers." V.J. told A.J. that when defendant did this, "she was afraid" and asked him "why he was doing it."

¶ 11    On cross-examination, A.J. testified that when she arrived home, the police did not tell her that there were allegations of sexual contact between V.J. and defendant. However, later in her cross-examination, A.J. answered "yes" when asked by defense counsel, "Isn't it true that one or more of the police officers that talked to you before you spoke to [V.J.] told you specifically to ascertain if [defendant] touched her or not?" A.J. then denied asking V.J. whether defendant "touched her private parts." Yet later in her cross, A.J. testified that after she spoke to V.J., she talked to the police and told them that V.J. denied being touched by defendant.

¶ 12    That apparent contradiction became a focal point of A.J.'s cross-examination. Eventually, A.J. clarified that after she relayed V.J.'s statements to the police, the police asked her to "go and ask her again without pressuring her if something else had happened." A.J. went to talk to V.J.

again and asked her if she had seen defendant and if he "said something about her dress and if he had seen her shorts." V.J. told A.J. that defendant "said [V.J.] looked nice and he had hugged her."

¶ 13    Bridget Carey testified that she worked as a forensic interviewer and therapist at All Our Children's Advocacy Center in Justice, Illinois. She explained that a forensic interview "is the process in which we interview kids" using "more open-ended style questions so the child can explain *** a situation that has occurred."  Carey testified that on July 20, 2015, she conducted a forensic interview with V.J. Carey testified that the interview was video recorded and that she reviewed the recording of the interview prior to testifying. She stated that the recording was a true and accurate recording of the July 20, 2015 interview. Relying on that testimony, the State then successfully moved the recording into evidence.

¶ 14    On cross-examination, Carey testified that "the goal" when interviewing children is to avoid asking leading questions. Carey testified that asking open-ended questions allows the child to "have their own narrative" or engage in "free recall," which, Carey agreed, was "the best way to investigate these types of claims[.]"

¶ 15    Carey then agreed with defense counsel that "children could be susceptible to being influenced by an adult[.]" However, she agreed that because July 20, 2015 was the first time she met V.J., she did not "really know anything about [V.J.'s] specific characteristics such as her personal susceptibility to being influenced by [Carey] as an adult[.]" In the same vein, in response to counsel's question, she admitted that she did not, to borrow counsel's phrasing, "conduct any kind of tests on [V.J.] to check her particular levels of suggestibility by being influenced by an adult." Likewise, Carey acknowledged that she did not ask V.J. any questions

intended to gauge her understanding of the "difference between reality and make-believe[,]" though she added that she "typically" does not ask such questions during her interviews.

¶ 16    On redirect, Carey answered no when asked whether she was required to "test suggestibility of a child prior to interviewing them[.]" Thereafter, Carey explained that, although leading questions are generally disfavored, "sometimes we do have to ask more direct questions so that the child understands what we are asking."

¶ 17    On May 10, 2017, the court granted the State's motion. It explained:

"In the instant case, the alleged victim's mother testified with the assistance of an interpreter that the victim told her that the defendant had touched her parts several times and she didn't want to say anything because she was afraid. The victim demonstrated to her mother by—the mother testified by putting her hands inside her pants, and the mother testified that the child did know the names of her parts.

With regards to the consistent nature of the statements, the statements made to Bridget Carey, the forensic interviewer from All Our Children's Advocacy Center, I do find were consistent in nature. There is a video of the forensic interview that exists and I did view. And in that interview, the alleged victim appears to be an intelligent, young child who answers the questions for the most part age appropriately and there is no indication of any motive on the child's part to fabricate.

* * *

The statements of the alleged child victim to Bridget Carey, the forensic interviewer employed by All Our Children's Advocacy Center, were made in the context of a victim sensitive interview that was arranged by law enforcement authorities. The

statements of the child to Bridget Carey are testimonial in nature and thus subject to the confrontation clause contained in the Sixth Amendment to the United States Constitution.

The State has represented that the child will testify at trial; and if she does, in fact, testify, the confrontation clause places no restriction on the introduction of the child's hearsay statements as the defendant will have the opportunity to confront and cross-examine the child.

Furthermore, I do find that the time, content, and circumstances of these statements do provide sufficient safeguards of reliability. And accordingly, if the child testifies at trial, her out of court statements to Bridget Carey shall be admitted through the testimony of Bridget Carey."

¶ 18    Thereafter, sometime before trial, defendant filed a motion to bar V.J. from testifying at trial on the ground that she was incompetent. The record does not contain a transcript of the argument on this motion or a copy of the court's ruling. However, it is clear that the court denied the motion, because V.J. testified at trial and defendant raised the denial of the motion as one of his many claims of error in his post-trial motion.

¶ 19    Defendant's trial began on April 18, 2018. At trial, V.J. testified that she was currently eight years old and was just about to celebrate her ninth birthday. Before answering any questions about the events underlying this case, V.J. answered "yes" when asked by the State if she "understand[s] what it means to tell the truth[.]"

¶ 20    Thereafter, V.J. testified that in the summer of 2015, she was in kindergarten. V.J. stated that she lived on the first floor of a two-floor apartment building and that during the summer, she liked to play outside her apartment. She testified that during the summer after kindergarten ended, she met a man, whom she identified at trial as defendant, that lived on a first-floor

apartment across from her. V.J. did not remember how she met defendant, but she recalled that she was in front of her apartment the first time she met him. Thereafter, the State asked V.J. "how often—when would you see him[,]" to which V.J. responded, "[o]n the nice days," because she would be outside jumping rope.

¶ 21    V.J. explained that when she saw defendant, he would talk to her. V.J. testified that no one was around when those conversations occurred, although she then stated that one of her friends, Giovanni, was present during at least some of defendant's interactions with V.J. V.J. stated that during these interactions, defendant was "nice."

¶ 22    Thereafter, the State asked V.J. if defendant ever did "anything that you didn't like." V.J. answered "[y]es." She explained that during the summer after kindergarten ended, during the daytime while she was outside, on multiple occasions, defendant touched V.J. on "one of [her] private parts." V.J. stated that she did not know the names for her private parts. To clarify, at the State's direction, V.J. stood up and indicated that she had private parts on her chest, her buttocks, and on her front between her legs. V.J. then testified that defendant touched her on her private parts on her buttocks and between her legs.

¶ 23    V.J. explained that when defendant touched her between her legs, he used his hand and the contact was skin-on-skin. She then testified that after the first incident of touching, which involved her front private parts, defendant invited her down to a basement where the apartment complex's washing machines were located so she could "see how [the basement] looked." There, alone with V.J., using his hand, defendant touched the top of V.J.'s buttock. V.J. noted that throughout her interactions with defendant, he only touched her buttock this one time.

¶ 24    V.J. then explained that on the last day she saw defendant before trial (*i.e.*, July 19, 2015), she was outside with defendant when he touched her front private part with his hand.

Later that day, the police came. V.J. testified that after the police came, she talked to her mom and told her what happened. However, she explained that she did not tell her mom what happened the first time they talked because she was "too scared."

¶ 25    V.J. then described her trip to the police station. She explained that on the night of July 19, she went to the police station with her mom. While they were there, V.J. saw a woman. V.J. did not know the woman's name, but she recognized her as a neighbor from her apartment complex. The woman came and spoke to V.J. and A.J. V.J. then told her mom what happened with defendant. After that, V.J. and A.J. went to the hospital, where V.J. was examined by a nurse and doctor.

¶ 26    On cross-examination, V.J. testified that sometimes when she was outside with defendant, there were bugs around that would try to bite her and that defendant would use his hand to try to "shoo" the bugs away. V.J. then testified that she told her mom that defendant touched her buttock in the basement, but she did not tell Carey that during the VSI because she was "too nervous." V.J. then clarified that when defendant touched her in the basement, he touched her above her buttock on the small of her back.

¶ 27    A.J. testified that on July 19, 2015, she lived at an apartment located at 4305 South Harlem Avenue with A.J. and her three other children, N.J., age 19, N.J., age 12, and M.J., age three months. She testified that they had been living at the Harlem Avenue apartment since January 2015 and that from January to July 2015, she did not have any "encounters" with any of her neighbors. A.J. testified that she did not see V.J. talking to or interacting with any of her neighbors. She explained that when V.J. finished kindergarten in June 2015, she stayed around the apartment, where she was supervised by her older brother and sister, N.J. and N.J.

¶ 28    On July 19, 2015, A.J. worked from 9 a.m. to 5:30 p.m. At some point after she left work that evening, A.J. received a phone call from her daughter, N.J. Afterwards, A.J. went home. When she arrived home, V.J., N.J., N.J., and the police were there. A.J. spoke to the police, and then, at the police's request, spoke to V.J. in her bedroom. A.J. asked V.J. what she did during the day. V.J. told A.J. that she went to the mall, Walgreens, and got something to eat.

¶ 29    A.J. then went to talk to the police again. During this second conversation, the police asked A.J. to talk to V.J. again, but advised A.J. "not to pressure V.J." At this point, according to A.J., she still did not know what she was supposed to talk to V.J. about. A.J. then spoke to V.J. a second time. During this conversation, A.J. asked V.J. "if she had a nice day," "if somebody had said something about her dress," and if "somebody had seen her shorts[]" that she had on underneath her dress. A.J. asked V.J. if defendant said something about her dress, but she said no.

¶ 30    A.J. then spoke to the police a third time, telling them that V.J. "had not said anything strange." After that, A.J. and V.J. went to the police station. Before leaving, the police told A.J. that V.J. would be taken to the hospital to be examined. According to A.J., an ambulance arrived, but it "couldn't take [them] to a specialty hospital," so she and V.J. left with a police officer and went to the Stickney police station.

¶ 31    When they arrived at the police station, A.J. and V.J. went to a waiting area. There, they saw a woman that A.J. recognized from her Harlem Avenue apartment complex. A.J. testified that she did not know the woman's name and had never spoken to her. The woman was with a police officer. When she saw A.J. and V.J., she asked the police officer if she could speak to A.J. After the officer said yes, the woman told V.J. "[t]o tell the truth about what had happened." When asked to describe the tone of the woman's voice, A.J. answered, "[w]orry." According to

A.J., when the woman said that, V.J. started crying and said that defendant "had touched her, touched her parts." A.J. testified that she was "surprised" by that revelation. She reacted by hugging V.J., and she told her "not to be afraid" and that "she had to tell the truth."

¶ 32    Thereafter, A.J. testified that V.J. explained how defendant touched her. Specifically, V.J. stood in front of A.J. and "showed [A.J.] with [V.J.'s] hand how [defendant] introduced his hand inside the pants." (Later, A.J. clarified that V.J. showed her how defendant "pulled down her pants and touched her vagina.). A.J. asked V.J. how many times defendant touched her, and V.J. said "[m]any times."

¶ 33    Afterwards, A.J. and V.J. went to Christ Hospital, where she was subjected to a physical examination for which A.J. was present. At this point, the State asked A.J. to "describe the examination that [V.J.] had to—they had done to her?" Defendant objected, and a sidebar ultimately ensued. Because this aspect of A.J.'s testimony forms the basis for one of defendant's main arguments on appeal, we quote liberally from the transcript on this point:

"Q. Can you describe the examination that Violeta had to—they had done on her?

MS. DOMPH [Defense Counsel]: Objection, Judge. This should come through a medical professional, I believe.

THE COURT: She may testify as to her observations, what she observed, so you may rephrase it. Sustained as to the form, but you may rephrase.

BY MS. ZAYYAD [Assistant State's Attorney]:

Q. Did you see the examination that was performed on Violeta?

A. Yes.

Q. What happened? What was that examination?

MS. DOMPH: Judge, I also object for relevance.

- 10 -

THE COURT: Overruled. She may testify as to her observations at that time.

MS. DOMPH: Judge, may I have a sidebar about this?

THE COURT: Sure.

* * *

THE COURT: Okay. Go ahead.

MS. DOMPH: Judge, I object to it coming out through the mother. I think it's unduly prejudiced—I think it's more prejudice than probative.

We're going to have a medical professional say what they did and the reasons they do that. But to have a mother testify to having to see her six-year-old have a gynecological exam, I think, is unnecessary. I don't think that—I think it may be very emotional, and I find it more prejudicial than probative.

MS. ZAYYAD: Your Honor, the examination that Violeta had to endure, it goes to the particularly the evidence that would be presented during the trial. It also goes to what this witness, the mother, had observed occur with Violeta when they went to the hospital. It's her perception of what exactly happened. She's not getting into a medical opinion, and I don't believe that it has—I don't find it to be more prejudicial than probative.

Specifically, I believe that the—there's no limitation by any case law or any statute that limits us from which witness gets to testify to what had occurred when there are multiple witnesses.

THE COURT: I do find it probative. It will be allowed over objection.

I just will give the warning to the State as to this. She may testify to her observations. She may not testify as to any conversations that occurred between medical

personnel. And she can testify as to what she observed in that room as far as any type of exam that she saw conducted, but you're not allowed to go into any medical opinions, medical diagnoses, or anything of that nature. Okay?

      MS. DOMPH: Judge, may I just—one more thing. Do they intend to talk about it being very distressing and painful on the child? Because I do think if they cross that line, that would be more prejudicial—

      THE COURT: She can testify to her observations and her observations of how Violeta, the child, was in that room during the exam.

      MS. DOMPH: Well, obviously we object. That's not relevant. So thank you.

      THE COURT: Okay. I do find it relevant.

      MS. DOMPH: Thank you for your ruling."

When testimony resumed, A.J. testified that she observed medical personnel take samples from V.J.'s nails, mouth, and vagina.

¶ 34    The next day, A.J. took V.J. back to the police station. From there, they went to All Our Children's Advocacy Center for V.J.'s VSI. A.J. testified that she was not present for the VSI.

¶ 35    On cross-examination, A.J. testified that she had observed V.J. playing outside with defendant on prior occasions, but that V.J. never reported anything "unusual" before July 19, 2015. In addition, A.J. testified that when she could not watch V.J., her older daughter, N.J., would supervise V.J. A.J. then testified that N.J. never reported anything unusual occurring between V.J. and defendant.

¶ 36    Thereafter, A.J. reiterated her prior testimony that when she arrived home on the evening of July 19, 2015, the police did not inform her that someone was alleging that defendant had touched V.J. inappropriately. A.J. denied being told by one of police officers to "talk to [V.J.] if

[defendant] had touched her or not[.]" Thereafter, defense counsel asked A.J. if she recalled giving the following testimony during the section 115-10 hearing in March 2017:

" 'Isn't it true that one or more of the police officers that talked to you before you spoke to Violeta told you specifically to ascertain if the man had touched her or not?

Response: Yes.' "

A.J. testified that she did not remember giving that testimony. A.J. then reiterated a second time that the police did not apprise her of any allegations against defendant concerning V.J. A.J. then denied asking V.J. if defendant touched her private parts.

¶ 37    Elizabeth Metcalf testified that she worked as a registered nurse at Advocate Children's Hospital in Oak Lawn, Illinois. On July 19, 2015, at around 11 p.m., she was working in the emergency department at Advocate and assisted one Dr. Theresa Schwab with the treatment of a patient named V.J. Metcalf testified that she interviewed V.J., and that V.J. "stated she had been touched, and when we asked her where, she placed her hand over her vaginal area." Metcalf then asked V.J. "if it was on top of or underneath her clothes," to which V.J. answered "underneath." In order to "get an idea of [V.J.'s] sense of anatomy," Metcalf then asked V.J. if she had been touched on her arm (" 'No.' ") and her buttocks (" 'Sometimes, but not today.' "). Based on V.J.'s statements, a sexual assault evidence collection kit was used on V.J. Metcalf testified that she performed the evidence collection, and Dr. Schwab administered V.J.'s physical examination.

¶ 38    On cross-examination, Metcalf testified that she was present when Dr. Schwab examined V.J. Metcalf testified that Dr. Schwab "did a general head-to-toe exam," which included an assessment of V.J.'s "respiratory status," "cardiac sounds" and her "pulses and her perfusion throughout her body." In addition, Dr. Schwab "did a belly exam to feel [V.J.'s] belly, and then

she did a head-to-toe skin exam looking for any signs of cuts or bruises or anything out of the normal for your skin." And finally, Dr. Schwab examined V.J.'s vagina.

¶ 39     Metcalf explained that Dr. Schwab "looked first and then palpated. So touched lightly with her fingers for signs of pain, and just looked for any signs of redness or discharge or scratches, things of that nature." Defense counsel then asked Metcalf, "what did [Dr. Schwab] find?" The State objected to that question, and the court sustained the objection. The following colloquy between defense counsel, the State, and the court then ensued:

"Q. You were present. Did you see what the doctor was doing?

A. I was focused on the patient and keeping her comfortable, so I was not involved in the patient's exam.

Q. All right. But you testified off a report, correct?

A. Correct.

Q. And you used that to refresh your recollection?

A. I did.

Q. Okay. And it's fair to say there were no abnormalities found, is that right?

MS. PAPA: Objection.

THE COURT: Sustained.

BY MR. ETTINGER:

Q. There was no external evidence of trauma, was there?

MS. PAPA: Objection.

THE COURT: Sustained.

MS. DOMPH: Sidebar.

Michael, sidebar.

MR. ETTINGER: Sidebar, Judge.

THE COURT: All right. Ladies and gentlemen, at this point in time we will recess once again to have a sidebar, and we'll resume in a moment.

* * *

MS. DOMPH: When the prosecution told me they could not get the doctor in, I specifically inquired whether the nurse would be able to testify to everything the doctor had in her report, and the doctor—we had that conversation.

MS. PAPA: That was not what you said. What she did. I said she would—the collection of the kit.

MS. DOMPH: That was not my interpretation, Judge.

MS. PAPA: I know what the nurse can and cannot testify to.

MS. DOMPH: Therefore, I asked the question, because we knew what the report said, that the—the offer of proof is that the report says there were no abnormalities. None. And now they are trying to stop the jury from learning that because they couldn't get their doctor in. We would have insisted that that doctor come in if they are not going to agree that the Doctor's report says there is no abnormalities.

THE COURT: You have to subpoena the doctor. I mean, it is your obligation if you want a witness to testify, to subpoena that witness.

MS. DOMPH: It is not my obligation if it's been represented to me that she could testify to everything the doctor did.

MS. PAPA: I did not say, one, she can testify to everything she did. But even if she did—even if I did, she did testify to what the doctor did. She cannot testify to findings because they are not her findings, and she would simply be stating what's in her

report. She cannot do that as a nurse. She has no idea whether there was trauma or no trauma.

THE COURT: Let me ask you this.

MS. PAPA: And—

THE COURT: Let me ask you this. I am not privy to your folks' conversations, but I do know that none of this has been spread of record until this point in time. And everyone knows their ability to get witnesses before the court through the subpoena process, and that should be done. Now, if there is a report that exists and this report is saying what the defense is saying it says, are you willing to stipulate—

MS. PAPA: I am not. And there is a good reason, your Honor. And I would want to spread this of record, because I am not just being difficult.

THE COURT: Okay. Let's hear it.

MS. PAPA: I originally had offered to stipulate to chain of evidence on the collection of the kit and everything, and those were refused to me. I was not planning to bring the doctor in for purposes of no trauma, trauma. I was bringing the doctor in to get the kit in. When the doctor couldn't come in, the nurse was brought in. If the doctor were here to testify about trauma or no trauma, she would actually testify to more than just there was no trauma, because then she would also testify to, in her experience, whether there would be expected to see trauma under these types of allegations. And unless there is going to be a stipulation to everything the doctor would testify to, I would be happy to stipulate to that.

THE COURT: Well, at this point in time with this witness, it is not permissible to go into that area with this witness because it is impermissible cross-examination. If you

folks during our lunch hour work something out as far as a stipulation, then you can address that with me. But I am solely back here to rule on this witness and the testimony from this witness, and your objection—the State's objection is sustained.

MR. ETTINGER: Can I make a record?

THE COURT: Yes.

MR. ETTINGER: First of all, she is an expert, so she can testify to hearsay. She can testify as to what she did there. Next, the State told us for weeks and weeks, I am bringing a witness in from Canada, the doctor. And that's why we had to wait for this.

So we relied on you, that you were bringing the doctor in. She's coming from Canada. We talked all last week. Now she's not here, and we certainly—can I finish? Because we certainly would have subpoenaed her. But we relied on you, who told us the opposite.

MS. PAPA: The witness was here from Canada. It was Ms. Valerie Clermont Beaudoin. That was the witness I brought from Canada. It's the one I have been telling them about.

MR. ETTINGER: The doctor. She told us the doctor.

MS. PAPA: I never said it was a doctor.

MR. ETTINGER: Yes, you did.

MS. DOMPH: My understanding is that when Michelle and I talked about this, about the doctor not being available, the doctor from Christ—

THE COURT: Dr. Schwab.

MS. DOMPH: Yes. I said, Are you going to bring her in on a different time? She said she is not available at all during the trial.

THE COURT: Okay.

MS. DOMPH: So that was what—so we—

THE COURT: That was—

MS. DOMPH: Out of courtesy I agreed, because I specifically—

THE COURT: Agreed to what?

MS. PAPA: You don't have to agree.

MS. DOMPH: No. I understand I don't have to agree; but I said—you told us the nurse was going to testify, and my understanding, just for the record, was that the nurse would be privy to what is in the report and have personal knowledge of it. And I think perhaps, Judge, she does, because if she was in that room and there were abnormal findings, there would have been some kind of treatment or documentation, and she said there was documentation. So I think a fair—she took the documentation. So I think a fair question would be, You documented what the doctor told you, and you documented that there was no abnormalities. She documented it, according to her testimony.

THE COURT: That's an improper question. So that objection is sustained. So let's go back out.

MR. ETTINGER: Well, can I make an offer of proof?

THE COURT: I think you just did.

MR. ETTINGER: Well, I want to make sure that—

THE COURT: You just did.

MS. DOMPH: Well, no. He had the wrong country where she was from.

MR. ETTINGER: My offer of proof, Judge, is I'd cross-examine her based on her direct testimony that all these examinations were done, and I would ask her, was there

any external evidence of trauma or discharge? She would say no. I would also ask her, based on all her examinations, did she find any abnormalities, or were there any found, and she will say no.

THE COURT: Okay. She has already testified that she did not do the examination, that she was taking care of the patient's needs at that point and does not know about the doctor's findings. She is not a medical doctor and is unable to provide that diagnosis. That is why the objection is sustained."

¶ 40    When Metcalf's cross-examination resumed, defense counsel asked whether V.J. was given any treatment following the examination. Metcalf answered "[n]o," explaining that Dr. Schwab neither prescribed medication to V.J., nor did she "order any additional labs outside of what we collect for the evidence kit." Thereafter, defense counsel asked Metcalf if she saw Dr. Schwab "perform any procedure's on [V.J.'s] sexual organs after the examination?" Metcalf answered:

"Due to the patient's age, we do not do speculum exams because her sex organs are not mature to hold the plastic inside of her vaginal canal.

An extent to that, due to the fact that we are an emergency department, we provide life-saving care and then refer elsewhere for any follow-up, so we don't generally, or in this specific case, do any kind of procedures on genitalia."

Thereafter, defense counsel asked Metcalf whether, "after the examination," Dr. Schwab "treat[ed] [V.J.] medically in any fashion ***?" Metcalf answered, "[n]othing other than providing a follow-up physician for the patient to see."

¶ 41    Blanca Reyes testified that on July 19, 2015, she lived on a second-floor apartment in an apartment complex located at 4305 South Harlem Avenue in Stickney, Illinois. Reyes testified

that her apartment consisted of a single bedroom, a "small dining room," and a living room that has a "big window that faces the street." She explained that her living room window looked out on the apartments "in the front" that were across from her unit. Reyes then testified that although she would recognize her neighbors, she was not friends with any of them—as she put it, "I would just say hi and that's it."

¶ 42     Thereafter, Reyes testified that on the evening of July 15, 2015 between 7 and 8 p.m., she was in her living room exercising on a treadmill next to the window. Reyes testified that there was a television in front of the treadmill and that the living room window was to her right. Reyes stated that because it was summer, the lighting was clear, and it was still light out.

¶ 43     At some point, Reyes looked out her window. She saw some children playing and "[t]he guy that is there"—referring to defendant. Reyes testified that when she saw defendant, he was "with [V.J.] right next to him." She explained, however, that she did not know V.J. and that in the past, she had seen her only "with [A.J.] when she was coming in the house. I was coming back from work and I would always see her."

¶ 44     Reyes testified that when she saw defendant and V.J., defendant was "[s]itting down in like a beach chair," and V.J. was "seated in a little chair." Thereafter, the State asked Reyes if she saw anything that "caught her eye?" Reyes responded, "[y]es. [Defendant] was putting his hand in [V.J.]. And I was so scared." Clarifying, Reyes testified that defendant was putting his hand in V.J.'s "part." The State then asked Reyes, "if you are the defendant, can you demonstrate the motion you saw [defendant] make." Reyes testified that defendant "went like this and then he went like this," and "then he was looking around, turning around to see if somebody was looking." After that testimony, the court directed the State to "reflect for the record what [Reyes] did with her hand[.]" The following colloquy ensued:

"MS. PAPA: The witness has indicated with her left hand—she squatted down. She's indicating with her left hand, palm up, pushing forward to the side, and then pulling back—a

THE WITNESS: And then he would do this.

MS. PAPA: And putting her fingers back to her nose."

¶ 45    Reyes testified that from her vantage point, she could see V.J.'s legs. She testified that she saw defendant's hand on V.J.'s "knee, the skirt, by her legs." The State then asked Reyes to demonstrate defendant's hand motion a second time. Thereafter, the State noted for the record that Reyes "with her right hand she showed going up into her – between her legs, touching her pelvis, between her legs, and then she said—demonstrated with her left hand, with this hand." She testified that she saw defendant do this four times at approximately one to two minute intervals. She testified that each time, defendant put his hand up to his nose. Reyes testified that while defendant was doing that, she could see V.J. and saw that she "was scared, like this, just looking at him. She was scared."

¶ 46    Reyes testified that when she saw what defendant was doing, she "got scared a lot," "screamed," and called her husband, who was sleeping at the time. Reyes testified that she went to her bedroom and woke her husband, who in turn told her to call the police. After that, Reyes called the police. She explained that she did not call the police the first time she saw defendant touch V.J. "[b]ecause [she] just wanted to see he would keep doing it and doing it." She then testified that she was scared when she called the police, stating, "I had never called the police. I didn't want any problems. But it was a little girl. It's a little girl."

¶ 47    According to Reyes, when she called the police, she had to wait approximately 15-20 minutes for someone who spoke Spanish. During that time frame, Reyes observed V.J. running

around with other children. Eventually, Reyes saw the police arrive. She testified, however, that she did not go down to talk to the police because she "didn't want any problems." Instead, Reyes went to the police station "[a]fter everything happened."

¶ 48    Reyes then testified that when she was approximately 36 to 40 feet away when she was observing defendant and V.J., and that she was able to see defendant from his head down to his mid-thigh. Reyes was then asked whether there was "anything in [her] way between [her] apartment window and where [defendant] lives that would block [her] view?" She answered, "[t]here is a railing, and a folding mat." Later in her examination, however, Reyes clarified that the mat did not obstruct her view. Reyes then testified that when she was watching defendant touch V.J., the only thing that obstructed her view was V.J.'s dress. She explained, however, that V.J.'s dress obstructed her view of defendant's hand because his hand was underneath her dress.

¶ 49    In addition, Reyes testified that her living room window has blinds, but they were open, "looking down." Reyes explained that when she was watching defendant, she was "so scared that I was looking like this, very close to the window," with her face close enough that it could touch the blinds.

¶ 50    Reyes then testified that later that night, she went to the police station. She stated that when she was walking out, she saw A.J. and "the little girl," "that this guy [*i.e.*, defendant] was grabbing." Reyes testified that V.J. "looked sad." Reyes sat down on a bench near A.J. and V.J. and said to V.J., "tell your mother what the guy was doing to you." V.J. started crying and A.J. hugged her. Reyes then left the police station. Reyes denied ever telling V.J. that she saw what defendant did, stating,"[n]o, no, I didn't tell her anything."

¶ 51    At the end of Reyes's direct examination, the State showed Reyes a picture of defendant that had been introduced into evidence and asked Reyes, "Does that truly depict how [defendant]

appeared on July 19, 2015?" Reyes responded: "Yes. He has the same—I am always being scared of him." Defense counsel immediately objected and moved to strike. The court sustained the objection and stated "[t]hat will be stricken." Reyes's direct examination there ended.

¶ 52    Defendant then requested a sidebar, which the court granted. The following colloquy ensued:

"THE COURT: Go ahead.

MS. DOMPH: We move for a mistrial. This witness should have been prepared that she is not allowed to voice her opinion about the defendant, her being afraid of him. She wasn't prepared. She blurted out that she's always been afraid of him, and we believe the prejudice cannot be overcome.

MS. PAPA: That's not what she said. "I will always be afraid of him.' She didn't say, 'I always was afraid of him.'

MS. DOMPH: Okay.

MS. PAPA: When she saw his picture, 'I will always be afraid of him.'

MS. DOMPH: Okay. I took the notes differently, but if it is that, it is the same problem. They have an obligation to instruct their witnesses not to offer personal opinions and not to unduly prejudice a defendant by 'I will always be afraid of him.' It has tainted the entire day—

THE COURT: Your motion for a mistrial is respectfully denied. I did admonish the jury to strike that and I sustained your objection. If you wish, I will admonish them further, but I don't like to highlight that information again. But if you want me to go on and tell them they are ordered not to consider the statement made by the witness in any way, I will do so. But if not, I have sustained your objection. I did tell that it was stricken,

and I don't believe that it has so infected the case to cause a mistrial. So your request is respectfully denied but noted.

Do you wish that I admonish further?

> MS. DOMPH: No. I don't think we can unring this bell.
>
> THE COURT: All right."

¶ 53 Reyes's testimony then resumed. On cross-examination, Reyes was questioned extensively about her ability to see outside. Reyes testified that her living room window had two sets of blinds. She noted, however, that "[f]rom inside my house, you can see downstairs[,]" and she testified that when she observed defendant touching V.J., both the "front blinds" and "back blinds" were open. She then clarified that the "back blinds" were "all the way open," and the "front blinds" were "down." Reyes was then presented with People's Exhibit 17, which depicted her living room, and testified that the picture depicted the condition of her blinds on July 19, 2015, though she added that on July 15, there was also a run hanging over the railing.

¶ 54 Reyes first saw defendant touching V.J. around 6 p.m., but she did not call the police until 7 p.m. She then testified that she observed defendant touch V.J. four times over a span of 10 minutes. Later, she testified that she observed defendant touching V.J. "during an hour," but she made clear that defendant "was not doing it for an hour." Reyes testified that she did not take a picture or video of defendant and V.J. She also testified that she did not want to wake her husband up "because he has to go to work." Still later, Reyes was impeached with a video of a statement she gave to the police, in which she said that defendant touched V.J. six times, as opposed to four times, which was Reyes's testimony at trial.

¶ 55    Reyes reiterated her prior testimony that she postponed calling the police because she was scared. She explained, however, that eventually she "start[ed] thinking, how can I be afraid if he is doing this to a little girl[]" and decided to call the police.

¶ 56    Defense counsel then essentially accused Reyes of fabricating her testimony. Her testimony here is worth restating in large part:

> "Q. Well, the bottom line is, Mrs. Reyes, you never saw anything, isn't that right?
>
> A. Nothing of what?
>
> Q. Nothing happened.
>
> A. What do you mean, didn't happen?
>
>                      * * *
>
> Q. Nothing happened between Mr. Zientek and Violet; that's why you waited an hour, because you didn't see anything?
>
> A. I don't understand.
>
> Q. You saw the picture from—that I put on the screen where you could look out from your blinds in your own apartment?
>
> A. Yes.
>
> Q. And they were about 40 to 50 feet away from you, the distance between your front window and where Mr. Zientek and Violet were sitting, is that right?
>
> A. 50 feet, no. 40. You can see everything from my house.
>
> Q. What you can't see is what happened beneath that gate that's by Mr. Zientek's house, isn't that correct?
>
> A. You can see everything exactly from my house what he was doing.
>
> Q. You couldn't see where his hand went, could you?

A. You could see everything he was doing. He would put it in there and then he was looking everywhere. Or he is crazy to be doing something like that.

Q. Did you see him put his hand all the way up the little girl's skirt, yes or no?

A. Yes, he put his hand. I didn't see all the hand, but he put his hand in there.

Q. So you didn't see where the hand touched; that's correct, isn't it?

A. But he would do this. That's because he was doing something.

* * *

Q. You didn't see what his hand was touching, if anything, did you?

A. No. But I saw what he was doing. He was smelling his hand.

Q. My question is, you didn't see what his hand was touching, yes or no?

A. No.

Q. Thank you.

A. I saw that he put his hand."

¶ 57 Thereafter, defense counsel asked Reyes if she could have opened her window and yelled at defendant. She responded: "Scream? I am not crazy. What am I going to scream?" She later added, "[a]ll I have to do is call the police and they have to attend to whatever, what's going on."

¶ 58 Detective Sergeant Kevin McGuire testified that in July 2015, he was a corporal detective with the Stickney Police Department. On the evening of July 19, 2015, Sergeant McGuire was called in to the police station to assist with a sexual assault investigation. When Sergeant McGuire got to the station, he learned that a suspect was in custody and that a witness (Reyes) was at the station waiting to be interviewed. With the assistance of a translator, Sergeant McGuire interviewed Reyes. Sergeant McGuire learned that the victim was a girl named V.J.

¶ 59   On July 20, 2015, Sergeant McGuire went to All Our Children's Advocacy Center for V.J.'s VSI. Sergeant McGuire testified that he observed Carey interview V.J. He explained that he was able to do so because "[V.J.] was being interviewed in a room that was being recorded, and I was able to sit in another room opposite her and watch the video as it was being recorded." The State then asked Sergeant McGuire: "So you were able to observe all the questions and answers that were asked as they were being asked?" Sergeant McGuire responded, "Yes, ma'am." The following colloquy then ensued:

"Q. Today prior to your testimony, did you have an opportunity to review a video recording of that interview between Bridget Carey and [V.J.] on July 20th of 2015 at approximately 1:20 p.m.?

A. Yes.

Q. I am going to show you what's marked as People's 19 for identification purposes. Do you recognize what I am showing to you here?

A. Yes.

Q. What is that?

A. That's the video I just watched.

Q. And how do you know that's the video that you have just reviewed?

A. I signed it and initialed it.

Q. And when did you do that?

A. After I was finished watching the video.

Q. Today?

A. Today.

Q. When you watched that video, did it truly and accurately show all the questions and answers as they were conducted on July 20th of 2015 by Bridget Carey with Violet Jimenez at the All Our Children's Advocacy Center in Justice, Illinois?

A. Yes.

MS. PAPA: Your Honor, at this time I'd ask to strike the identification on People's Exhibit 19 and move it into evidence.

THE COURT: Any objection?

MS. DOMPH: Yes.

THE COURT: Do you wish a sidebar or—their foundation has been properly laid for the admission of the exhibit. So it would be admitted over objection.

MS. DOMPH: Judge, could it be admitted subject to my—waiting until my cross-examination?

THE COURT: Yes, it can."

¶ 60    On cross-examination, Sergeant McGuire testified that V.J.'s VSI lasted 45 minutes and that he did not "step out at all during the 45 minutes[.]" Sergeant McGuire testified that when he watched the interview, he was watching on a "[a] video. Closed-circuit TV[,]" and not through a two-way mirror. Sergeant McGuire testified that he did not watch the video until two hours before his testifying. Defense counsel then asked Sergeant McGuire: "It would be fair to say that you don't have independent recall of every question and every answer that was asked of that child almost three years ago?" Sergeant McGuire responded, "That is correct." Thereafter, defense counsel asked Sergeant McGuire: "And so it would be fair to say, wouldn't it, even though you testified earlier that what you saw in the video three years later truly and accurately depicted what went on three years ago, wouldn't it be fair to say that you don't have an

independent recollection of the questions and answers that were done or given to this child three years ago? You don't have an independent recollection?" Sergeant McGuire responded, "Every question, no."

¶ 61    At the conclusion of Sergeant McGuire's testimony, the State renewed its request to publish the video of V.J.'s VSI to the jury. Defendant requested a sidebar, during which the following colloquy occurred:

"MS. DOMPH: Judge, we object. We don't believe the foundation was laid. Although he said that he watched the video and it was the same conversation between the two parties in the room as it was at the time, July 20, 2015, common sense tells you that he can't possibly know that because it was three years ago. I tested his memory. He couldn't remember what time he arrived, he couldn't remember the exact questions and answers with any independent recollection. He couldn't—there was another question I asked him and he couldn't remember, and he admitted because three years had gone by. So to try to put in this kind of evidence through someone that just watched it and hasn't watched it for almost three years, and assert that he can actually know that that's a true and accurate copy of the interview, because the—he wasn't a participant like Bridget Carey. He observed it three years ago. And so I do not think they have laid the foundation, and we object.

* * *

MS. DOMPH: Judge, in addition, we object because we believe putting the video in through this witness deprives us of—deprives Mr. Zientek of his Sixth Amendment right to cross-examine the witness who did the interview. We believe that when you did your 115-10—when we had our 115-10 hearing, Bridget Carey was going to be the

witness that was allowed to talk about or put in the hearsay, and we would have had a right to cross-examine her. By putting it through a witness who was not a participant, who also, in our view, could not know that that video is a true and accurate copy from three years ago—at least Bridget Carey we know has seen it multiple times, she's testified about it, and she actually is the one who did the questions and received the answers. So by putting it through him, what the State is doing is depriving our client of the right to confront witnesses and cross-examine them, and I think that is improper.

THE COURT: Okay. Go ahead.

MS. PAPA: So under 115-10 your Honor, that ruling was based on a determination based on what the video contained, whether the time, content and circumstances were such that was sufficient reliability for admissibility of the statement. That has been ruled on. It is admissible.

Now, with regard to the right to confrontation, Crawford is that if the child testifies, that is the requirement that the child's statement can come in. The questions that Bridget Carey asked are not the evidence. It is the statements made by the witness victim in that video and the responses to those questions that you can draw the inferences from. So it is the opportunity to cross-examine the child, which they have had, and they did actually go into some questions regarding the content of what's in that video already with the victim, talking to her about some things about the purple lightning she discussed in the video, the tornado she discussed in the video, other things. So she did have an opportunity to cross-examine the victim witness, who is the subject of the statement.

Now, with regard to the proper foundation, in order to say that any witness, who says that they have to remember every single question and answer that was given three

years ago in order to lay the foundation, nobody could ever possibly be entered into evidence. That's not been the standard. He was there. He watched the entire interview from beginning to end. He saw it. He's looked at the video. He says that is an accurate reflection of the interview that was conducted by Bridget Carey and the victim, [V.J.]. He does not have to say that he remembers every question and answer that was asked. He says that that interview video is an accurate recording of that interview. So the foundation has been met and Crawford has been complied with.

THE COURT: So the issue is two-fold. One is, has foundation been laid with regards to this video? The witness has testified clearly that he was present at the time the interview occurred, he watched the interview, it is a true and accurate representation of what occurred during that interview. And he's initialed it. It is the actual DVD that he actually watched and is indicating represents that interview that he was a witness to. So as far as foundation, I feel a proper foundation has been laid.

As to the argument that you have the right to cross-examine the person who took the interview, it is likened to a consensual overhear that is often admitted into evidence where a police officer overhears a conversation between a defendant and a victim or a defendant and a witness, and the officer puts in that tape, video or whatever, and neither the victim or the defendant ever testifies to it. It's not required. The requirement is, has there been a proper foundation for it, has it been laid properly, and was this witness qualified? He has been. I believe they have abided by that.

I will note the defense objection, but respectfully it is overruled. The exhibit may be admitted and published over objection."

¶ 62    Officer Collin Lochridge testified that he was a Stickney police officer. On July 19, 2015 at around 8:22 p.m., Officer Lochridge was dispatched to an apartment complex at 4305 South Harlem Avenue due to a "report of a male who was inappropriate [*sic*] touching a younger female." The offender was described as "wearing a blue shirt and smoking a pipe." Officer Lochridge testified that when he arrived on-scene, he saw a person matching that description, whom he identified at trial as defendant, sitting in a chair in front of an apartment. Officer Lochridge testified that when he saw defendant, he was with "a small child, younger girl, sitting in a little elephant chair[]" "pretty much right next to" defendant.

¶ 63    Officer Lochridge and his partner, Officer Poindexter, approached the girl, who he later learned was named V.J., and asked if she could get her mother. According to Officer Lochridge, V.J. said yes and "walked directly across the courtyard into the other apartment building ***." Officer Lochridge followed V.J. and spoke to her sister, N.J., who said that their mother would be home in 10 minutes. Officer Lochridge told N.J. to keep V.J. inside and not to talk to her.

¶ 64    Officer Lochridge and Officer Poindexter then went and spoke to defendant. Officer Lochridge "advised [defendant] of the allegations against that were alleged against him" and told him "he needed to come to the station with us." Defendant said "okay" and "came willingly." Officer Poindexter took defendant to the police station, and Officer Lochridge remained on-scene.

¶ 65    At that point, A.J. arrived home, and Officer Lochridge spoke to her in the doorway of her apartment. After that conversation, A.J. went into the apartment, and Officer Lochridge left to take pictures of the potential crime scene. A.J. then left the apartment and spoke to Officer Lochridge again. During this conversation, Officer Lochridge asked A.J. if he could have the clothes V.J. was wearing that day. A.J. went back into the apartment and a few minutes later,

returned with the clothes that Officer Lochridge saw V.J. wearing when he first arrived on-scene. Officer Lochridge then told A.J. that V.J. needed to go to Christ Hospital to see a "specialized nurse." The police called an ambulance, but the ambulance that arrived could only transport V.J. to MacNeal Hospital, so Officer Poindexter drove A.J. and V.J. to the hospital in his police car.

¶ 66    On cross-examination, defense counsel asked Officer Lochridge whether he was wearing a "green uniform" on July 19, 2015. He answered "[n]o." Officer Lochridge then testified that when he arrived, he advised his dispatcher that defendant "did not appear to be doing anything illegal."

¶ 67    At the conclusion of Officer Lochridge's testimony, the State rested its case. Defendant then presented his case-in-chief.

¶ 68    Defendant's first witness was officer Lochridge. On direct examination (now by defense counsel), Officer Lochridge testified that when he spoke to A.J. on July 19, he asked her to "ask [V.J.] if [defendant] had touched her or not[.]" When A.J. came to speak to him after she talked to V.J., A.J. said "that she asked [V.J.] if he touched her on her private parts and [V.J.] said no[.]" Officer Lochridge then answered "[n]o" when asked whether he asked A.J. to talk to V.J. again.

¶ 69    Defendant then called Carey. Carey testified that on July 20, 2015, she worked as a forensic interviewer at All Our Children's Advocacy Center. When asked whether she had learned through her training whether "open-ended questions with children are the best[,]" Carey responded, "[o]pen-ended questions are ideal to begin the interviews with." She explained that "[o]pen-ended questions are ideal because then the child uses his or her own words," but she went on to note that "follow-up questions usually are necessary as well." She agreed with defense counsel that "children could be susceptible to being influenced by adults[.]"

¶ 70    On July 20, 2015, Carey interviewed V.J. It was the first time she had met V.J. She also testified that when she interviewed V.J., she did not administer any test to assess whether V.J. was "susceptible to being influenced by adults[.]" Carey stated that she did not ask V.J. any questions to gauge her understanding of the "difference between reality and make-believe[.]"

¶ 71    On cross-examination, Carey testified that she had viewed the video of V.J.'s VSI and that the video "is an accurate description of our conversation."

¶ 72    Defendant testified that he was 60 years old on July 19, 2015. He has lived in an apartment located at 4305 South Harlem Avenue in Stickney, Illinois for 10 years. He first met V.J. in June 2015, when she came up to defendant while he was sitting in a chair outside his apartment. Thereafter, defendant saw V.J. "[m]any times, playing with other children[,]" and he specifically recalled speaking to her four or five times between June and July 19, 2015. Defendant testified that there were always other children and adults around when he interacted with V.J. Defendant denied ever touching V.J. between her legs. He also denied ever going into the apartment complex's basement with V.J.

¶ 73    Defendant testified that on July 19, 2015, he went outside around 6 p.m. Sometime between 6:30 and 7 p.m., V.J. came over by defendant, who was sitting in a chair outside his apartment, smoking a pipe. According to defendant, V.J.'s sister "walked over to me with [V.J.] in tow, carrying the elephant chair, plopped the elephant chair next to my chair, and had [V.J.] sit in it[,]" and then left. Thereafter, V.J. "went back and forth" between defendant's porch and her apartment to get toys. In all, defendant estimated that V.J. was with him for "15 minutes to a half hour." Defendant testified that V.J.'s chair "was much lower than mine."

¶ 74    According to defendant, sometime between 7:15 and 7:30, he saw some police officers from the Stickney Police Department. At this, defendant was sitting in his chair outside his

apartment, and V.J. was sitting next to him in her elephant chair. Defendant denied touching V.J. "on her private parts" or "between her legs" prior to the police arriving.

¶ 75    Eventually a police officer approached defendant. Defense counsel asked defendant whether the officer he saw was the same officer "who testified in this courtroom today." Defendant stated that he could not remember the officer's face because his attention had been fully captured by "all the equipment they were wearing." He explained:

> "When they appeared, my recollection is they were in green—what you'd see on television like tactical armory. And they walked between the buildings looking at everything like they're looking for something but they don't know where the something is. There were—it caused me to be concerned for my basic safety. In other words, the hairs on the back of your neck go up when you see something—people with guns walking around that aren't there normally, you go like, wait a minute, something's going on here."

¶ 76    According to defendant, when the police approached him, they asked him what he was doing ("[j]ust sitting out enjoying") and whether V.J. was his daughter ("[n]o"). Defendant asked what was going on and the police answered vaguely, "we're looking around." After the encounter with the police, V.J. stayed by defendant for 10 to 15 minutes. She ultimately left when someone in her apartment called her. At some point thereafter, the police came back and asked defendant to go to the police station.

¶ 77    Thereafter, defense counsel asked defendant, "on July 19th, 2015, and in July of 2015, were there bugs flying around in the apartment complex between the buildings?" Defendant answered "[y]es, many." He then stated that he would "swat" the bugs if he was sitting outside.

Defendant testified that when he was sitting with V.J. on July 19, there were more bugs than usual. He then testified that he swatted some of the bugs away.

¶ 78    On cross-examination, defendant testified that he could not remember if he ever physically removed bugs from V.J.'s body. He did not know Reyes, and the two did not have any prior problems or disagreements. Likewise, defendant testified that although he had met A.J. "on a limited basis," the two had never had any problems or disagreements.

¶ 79    In rebuttal, the State presented a stipulation to the effect that while defendant was at the police station, he stated that V.J. "is afraid of mosquitos and flies, swishing them, grabbed them if landed on her. A mosquito lands on a little girl's leg, you don't want to slap it. Did this four to five times." In addition, the parties stipulated that on July 19, 215, Officer Lochridge "was wearing a short-sleeved blue uniform."

¶ 80    The jury ultimately found defendant guilty of aggravated criminal sexual abuse for inserting his finger into V.J.'s sex organ, and not guilty of aggravated criminal sexual abuse for placing his hand on V.J.'s buttocks. The court sentenced defendant to 23 years' imprisonment. This appeal followed.

¶ 81                                ANALYSIS

¶ 82    Defendant first argues that the circuit court erred by admitting V.J.'s statements that she made during the VSI because the statements were unreliable hearsay. We disagree. Under the law, hearsay statements like those at issue here are admissible if the court "finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2014). "As the proponent of the out-of-court statements sought to be admitted under section 115–10, the State bears the burden of establishing that the statements are reliable and 'not the result of adult

prompting or manipulation.' " *In re Brandon P.*, 2013 IL App (4th) 111022, ¶ 39 (quoting *People v. Sharp*, 391 Ill. App.3d 947, 955 (2009)). We will not disturb a circuit court's ruling on a section 115-10 motion absent an abuse of discretion. *Id.*

¶ 83    We find no abuse of discretion occurred. To determine whether a child victim's testimony during a VSI was reliable, our supreme court has instructed us to consider several factors, including: "the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of similar age, and the lack of a motive to fabricate." *People v. West*, 158 Ill. 2d 155, 164 (1994). These factors, to varying degrees, all cut in favor of the State.

¶ 84    First and most prominent, the record before us discloses absolutely no motivation for V.J. to fabricate her allegations against defendant. Nor does the record show that anyone close to V.J. had a motivation to induce her to lodge false accusations against defendant. Indeed, during the section 115-10 hearing, A.J. testified that she did not know defendant. And that testimony, for what it's worth, was largely corroborated by defendant's trial testimony that he had only limited interactions with A.J. prior to July 19, 2015, and that the two had had no prior disagreements or disputes.

¶ 85    Likewise, we find it noteworthy that A.J. testified during the section 115-10 hearing that, while she recognized Reyes as a neighbor when she saw her at the police station, A.J. did not know Reyes's name. Equally important here is defendant's trial testimony that he did not know Reyes or have disagreements with her in the past. This testimony is critical to our analysis because, for all practical purposes, it eliminates the possibility that Reyes or A.J. might have had a grudge against defendant that they sought to settle by directing V.J. to lodge a false accusation against defendant.

¶ 86   Second, once made, V.J.'s outcry was by and large factually consistent. She told her mother, the police, and Carey that defendant touched her genitalia (she used the word "parts" because she was six, but her intended meaning has never been the subject of doubt). Notably, when she first told Carey what happened, she did so after Carey asked her if there was anything that happened recently that she wanted to talk about. Her response, delivered calmly and without equivocation: "Well everyday a man touches me here but I don't know why and I actually don't like it." While making that statement, V.J. pointed to an area on the front of her body between her legs.

¶ 87   Third, the record fails to disclose anything about V.J.'s mental state or faculties that might lead a reasonable observer to doubt the veracity of her statements. Once the State supplemented the record with the video of the VSI (after defendant failed to include it in the record on appeal), we viewed the video in its entirety. Having watched the video (and thus observed V.J. in much the same footing as the circuit court would have observed her during the section 115-10 hearing, no less), we are struck by V.J., who in our estimation presented as a bright, intelligent, six-year-old girl. Throughout the duration of the 45-minute interview, V.J. remained thoughtful and attentive. At multiple junctures, V.J. paused to correct Carey if Carey misstated a portion of V.J.'s testimony. And she stated unequivocally that when she came in for interview, no one told her what to say.

¶ 88   Defendant insists that our supreme court's decision in *People v. Zwart*, 151 Ill. 2d 37 (1992), requires a different result. It most certainly does not. In *Zwart*, the State failed to show that the child victim's out-of-court statements were accompanied by sufficient indicia of reliability because they were preceded in time by at least three interviews in which the child victim discussed the alleged sexual abuse—yet the State did not introduce any evidence about

those interviews. As a result, it was "impossible for the trial court to determine whether the victim was questioned in a suggestive manner," whether the child "was encouraged to accuse the defendant of sexual abuse," and "whether the victim's precocious knowledge of sexual activity was due to sexual abuse ***or was the result of suggestive interview techniques." *Id*. at 44-45. The facts in *Zwart* are nowhere close to those here. The circuit court did not abuse its discretion by admitting V.J.'s VSI statements.

¶ 89    Next, defendant argues that the introduction of V.J.'s VSI statements violated his rights under the confrontation clause. Defendant acknowledges "that the case law of this state has ruled on this issue repeatedly against" this argument, and properly so.  V.J. testified at trial, and as the Supreme Court explained in *Crawford v. Washington*, 541 U.S. 36 (2004), when a hearsay declarant "appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id*. at 59 n.9.; see *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 66 ("Where the declarant appears for cross-examination, even where the declarant does not testify to the substance of his hearsay statement, its admission is a nonevent under the confrontation clause.").

¶ 90    Next, defendant argues that the court erred by allowing V.J. to testify at trial because she was incompetent. This argument fails. "All witnesses are presumed competent to testify." *People v. Jackson*, 2015 IL App (3d) 140300, ¶¶ 45; see Ill. R. Evid. 601 (eff. Jan. 1, 2011). That presumption may be overcome, but to do so, the challenging party bears the heavy burden of showing that the witness "is *incapable* of either expressing himself or herself so as to be understood [citation] or of understanding the duty of a witness to tell the truth." *People v. Hoke*, 213 Ill.App.3d 263, 272 (1991). "The question of whether a witness is unlikely to tell the truth is a credibility determination for the trier of fact." *Jackson*, 2015 IL App (3d) 140300, ¶ 45. "A trial

court may determine a witness' competency to testify by observing the witness' demeanor and ability to testify during trial." *People v. Dempsey,* 242 Ill.App.3d 568, 585 (1993). We review the circuit court's competency determination for an abuse of discretion. *Jackson*, 2015 IL App (3d) 140300, ¶ 46.

¶ 91 Much of defendant's argument in this regard is merely a restatement of his numerous objections to the reliability of the statements V.J. made to Carey during her VSI. Yet the court viewed the video of V.J.'s VSI and ultimately rejected defendant's argument that her statements were unreliable. Implicit in that ruling was a determination that V.J. was a competent witness. We have already determined that V.J.'s statements during her VSI were reliable and admissible. We obviously do not agree that the court abused its discretion in allowing V.J.'s testimony.

¶ 92 Defendant next argues that the circuit court erred by admitting the video of V.J.'s VSI, because the State failed to lay a proper foundation for the video. In *People v. Smith*, 321 Ill. App. 3d 669 (2001), we adopted the standard for laying a foundation for videotapes articulated by the Michigan Court of Appeals in *People v. Heading*, 197 N.W. 2d 325 (Mich. App. 1972). Under that framework, to admit videotape evidence, the proponent of the video must lay "the foundation necessary to admit a motion picture and the foundation necessary to admit a sound recording." *Smith*, 321 Ill. App. 3d at 675.

¶ 93 "A sufficient foundation is laid for a motion picture when a witness with personal knowledge of the filmed object testifies that the film is an accurate portrayal of what it purports to show." *Id*. Here, Sergeant McGuire was personally present at the advocacy center when V.J.'s VSI was conducted and he watched the interview in real-time via a closed-circuit camera. Under these circumstances, Sergeant McGuire had "personal knowledge" of the interview. Likewise, Sergeant McGuire testified that he watched the video and that it "truly and accurately show[ed]

all the questions and answers as they were conducted on July 20th of 2015 by Bridget Carey with

Violet Jimenez at the All Our Children's Advocacy Center in Justice, Illinois[.]"

¶ 94    Undaunted, defendant maintains that Sergeant McGuire's testimony was insufficient

because he could not "recall what he saw." That is, defendant claims that because Sergeant

McGuire could not independently remember every single question and answer that occurred

during V.J.'s VSI, he could not as a matter of law have personal knowledge of the contents of the

interview. Defendant does not cite any case for this astonishing proposition, and we outright

reject it. If perfect recollection were the test for foundation, little video evidence, if any, would

ever be deemed admissible.

¶ 95    That leaves to be determined whether the State laid a proper foundation for the sound

recording portion of the video. In *Smith*, 321 Ill. App. 3d at 675, we explained:

> "A sufficient foundation is laid for a sound recording when a party to the conversation
>
> testifies to the accuracy of the recording and the defendant makes no claim of any
>
> changes or deletions in the recordings. [Citation.] Where, as here, no party to the
>
> conversation testifies to the accuracy of the recording, a sufficient foundation may be laid
>
> by evidence as to (1) capability of the device for recording; (2) competency of the
>
> operator; (3) proper operation of the device; (4) preservation of the recording with no
>
> changes, additions, or deletions; and (5) identification of the speakers."

¶ 96    Defendant maintains that Sergeant McGuire was not a "party" to V.J.'s VSI, and thus, the

five-part test applies. We are not so sure about that. But this is ultimately irrelevant. Carey, the

person who conducted the VSI, testified on cross-examination that she had viewed the video and

that it was accurate. Thus, even if Sergeant McGuire's testimony was insufficient to lay a

foundation for the sound recording (or the motion picture, for that matter) portion of the video,

the error was harmless, because Carey's testimony standing alone was sufficient to lay a foundation for the video's admission.

¶ 97    Defendant next argues that the court erred by precluding him from cross-examining Metcalf, the nurse who was present when Dr. Schwab examined V.J., about the results of Dr. Schwab's examination. We disagree. Metcalf was never qualified as a medical expert, and she did not participate in the examination, so her proposed testimony about the results of Dr. Schwab's examination would constitute inadmissible hearsay. See *Beltz v. Griffin*, 244 Ill. App. 3d 490, 494 (1993) (contents of medical reports prepared by another doctor constitute inadmissible hearsay).

¶ 98    Defendant next argues that the court erred by allowing the State to ask its forensic DNA expert, Valerie Beaudoin, a leading question. But Beaudoin's testimony could not have impacted the jury's verdict in any way whatsoever. Beaudoin testified that samples from V.J.'s vaginal swabs only showed the presence of V.J.'s DNA, and that she could not draw any conclusions as to the identity of the minor contributor of DNA found on defendant's hands. We thus cannot understand how the error in allowing the State to lead (if there even was an error) could have possibly prejudiced defendant.

¶ 99    Defendant next argues that the court erred by permitting A.J. to testify about her observations during V.J.'s medical examination. Assuming for the sake of argument that this testimony was irrelevant, as defendant so argues, we nonetheless find that the introduction of this evidence did not prejudice defendant, and thus cannot justify a new trial. The testimony at issue here was banal in every sense of the word. A.J. stated that medical personnel took samples from A.J.'s nails, mouth, and vagina. That was the sum of her testimony. A.J. never testified about the emotional effect witnessing these procedures had on her or her daughter, nor did the State make

any overt effort to play to the jury's sympathies in this regard. Thus, even if it was error to admit this testimony, defendant would not be entitled to any relief, as the evidence itself was so minor and non-inflammatory that it could not have impacted the jury's deliberations.

¶ 100   We next consider defendant's argument that the court erred by denying his motion for a mistrial after Reyes testified that defendant was scary. "A trial court has broad discretion to determine the propriety of declaring a mistrial." *People v. Hall*, 194 Ill. 2d 305, 341–42 (2000). "A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *People v. Redd,* 135 Ill.2d 252, 323 (1990). We have read the entire trial transcript and are unable to conclude that Reyes's single stray comment that defendant "scared" her was so prejudicial that its mere utterance deprived defendant of his right to a fair trial.

¶ 101   Next, pointing to highly granular (purported) defects in Reyes's and V.J.'s testimony, defendant maintains that the State failed to prove him guilty beyond a reasonable doubt. We disagree.

¶ 102   The right to due process, as guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2), requires proof beyond a reasonable doubt of every fact necessary to prove each element of the crime. *People v. Murray*, 2019 IL 123289, ¶ 28. In a challenge to the sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *People v. Brown*, 2013 IL 114196, ¶ 48. Thus, "[a] conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *People v. Harris*, 2018 IL 121932, ¶ 26.

¶ 103   We begin with defendant's arguments directed towards Reyes's testimony. Defendant argues that Reyes's testimony was incredible, among other reasons, because "she ha[d] two sets of blinds obstructing her view[,]" as well as a mat or rug hanging on the railing of her porch. These arguments fail.

¶ 104   To begin, at bottom, these arguments are nothing more than an invitation for us to reweigh the evidence and decide the case in defendant's favor. That we cannot do. As stated above, a reviewing court's task when presented with a sufficiency challenge is a modest one; our inquiry is confined to determining "whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *Brown*, 2013 IL 114196, ¶ 48. This is a narrow inquiry. Our supreme court has repeatedly and emphatically explained that a reviewing court faced with a challenge to the sufficiency of the State's evidence may not reweigh the evidence to override a jury's verdict. *People v. McLaurin,* 2020 IL 124563, ¶ 22 ("In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact."); *People v. Jackson*, 2020 IL 124112, ¶ 64 (" '[I]t is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." ' " (quoting *People v. Howery*, 178 Ill. 2d 1, 38 (1997), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *People v. Harris*, 2018 IL 121932, ¶ 26 ("The reviewing court does not retry the defendant and must draw all reasonable inferences in favor of the prosecution.").

¶ 105   The jury heard extensive testimony from Reyes about the layout of her living room, how her blinds were positioned, and her general ability to view defendant from her vantage point. Notably (and contrary to what defendant's argument seems to suggest), Reyes did not testify that she managed to watch defendant molest V.J. despite standing behind an impenetrable wall of

closed blinds that totally obstructed her view of the courtyard below. She said that one set of blinds was open and that she was looking through the other set. Moreover, the State augmented Reyes's oral testimony with photographic evidence that depicted what Reyes would have seen as she looked out her window, based on her testimony regarding how her blinds were positioned. Having reviewed Reyes's testimony and viewed the photograph in question, we find these arguments wholly baseless.

¶ 106    Defendant next directs a number of challenges to Reyes's testimony, claiming that various aspects of her testimony rendered her account of events unreliable. It is not necessary to restate these arguments here, for they all fail for the same reason: Defendant is again asking us to reweigh the evidence and rule in his favor. This we cannot, and will not, do.

¶ 107    That brings us to defendant's attack on V.J. These arguments require little analysis and do not justify extended discussion. Defendant merely points to minor inconsistencies in V.J.'s testimony and claims, on the strength of those inconsistencies, the jury should not have credited V.J.'s testimony. But these inconsistencies, minor as they were, were all brought out at trial and made known to the jury. The jury obviously did not believe that the minor discrepancies about which defendant complains warranted discrediting V.J.'s testimony, and neither do we.

¶ 108    Finally, defendant has raised a cumulative error argument, but that fails because defendant has failed to validly assert even a single claim of error.

¶ 109                                CONCLUSION

¶ 110    The judgment of the circuit court is affirmed.

¶ 111    Affirmed.